**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1275
_____

WILLIAM KRIEGER,
                              Appellant
v.

BANK OF AMERICA, N.A.
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(M.D. Pa. No. 4-16-cv-00830)
Honorable Matthew W. Brann, U.S. District Judge
_____

Argued: September 27, 2017

Before: AMBRO and KRAUSE, *Circuit Judges*, and CONTI,
*Chief District Judge**

(Opinion Filed: May 16, 2018)

---

  * The Honorable Joy Flowers Conti, Chief United
States District Judge for the Western District of Pennsylvania,
sitting by designation.

Brett M. Freeman     [Argued]
Carlo Sabatini
Sabatini Law Firm
216 North Blakely Street
Dunmore, PA 18512
    *Counsel for Appellant*


Michael C. Falk     [Argued]
Reed Smith LLP
1717 Arch Street, Suite 3100
Three Logan Square
Philadelphia, PA 19103
    *Counsel for Appellee*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

The same day Appellant William Krieger fell victim to a credit card scam and discovered a fraudulent $657 charge on his bill, he protested to his card issuer, Bank of America (BANA),[1] and was told both that the charge would be removed and that, pending "additional information," BANA considered the matter resolved. And indeed, Krieger's next bill reflected a $657 credit. But over a month later Krieger opened his mail to some particularly unwelcome additional

_____

[1] We refer here to Appellee as "BANA" as that is how Bank of America refers to itself throughout its briefing.

information: BANA was rebilling him for the charge. He disputed it again, this time in writing, but after BANA replied that nothing would be done, he paid his monthly statement and then filed this action, alleging BANA violated two consumer protection laws: the Fair Credit Billing Act, which requires a creditor to take certain steps to correct billing errors, and the unauthorized-use provision of the Truth in Lending Act, which limits a credit cardholder's liability for the unauthorized use of a credit card to $50. The District Court granted BANA's motion to dismiss the operative complaint after determining Krieger had failed to state a claim as to either count. Because we conclude the District Court's decision was contrary to the text, regulatory framework, and policies of both statutes, we will reverse.

## I. Background

### A. Statutory Background

Congress enacted the Truth in Lending Act (TILA or Act), Pub. L. No. 90-321, 82 Stat. 146 (1968) (codified as amended at 15 U.S.C. §§ 1601–1667f), in response to "widespread consumer confusion about the nature and cost of credit obligations." *Gennuso v. Commercial Bank & Tr. Co.*, 566 F.2d 437, 441 (3d Cir. 1977). TILA's express purpose is to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit." 15 U.S.C. § 1601(a). Serving to "even the often slanted credit and lending playing field," *Vallies v. Sky Bank*, 432 F.3d 493, 495 (3d Cir. 2006), *as amended on reh'g* (Feb. 1, 2006), and to "guard against the danger of unscrupulous lenders taking advantage of consumers through fraudulent or otherwise confusing practices," *Ramadan v. Chase*

3

*Manhattan Corp.*, 156 F.3d 499, 502 (3d Cir. 1998), the Act, in simplest terms, "reflects a transition in congressional policy from a philosophy of 'Let the buyer beware' to one of 'Let the seller disclose,'" *Mourning v. Family Publ'ns Serv., Inc.*, 411 U.S. 356, 377 (1973).

To further that policy, TILA generally requires that a creditor in a consumer transaction disclose, among other things: "(1) the identity of the creditor; (2) the amount financed; (3) the finance charge; (4) the annual percentage rate; (5) the sum of the amount financed and the finance charge, or total of payments; [and] (6) the number, amount, and due dates or period of payments scheduled." *Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180, 188 (3d Cir. 2011), *as amended* (Sept. 29, 2011) (internal quotation marks omitted). Creditors also must provide "explanations and definitions" of each of those terms, *id.*, as well as information regarding "borrowers' rights," *Koons Buick Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 54 (2004). All of this information, the Act mandates, must be disclosed "clearly and conspicuously," that is, "in a reasonably understandable form and readily noticeable to the consumer." *Rossman v. Fleet Bank (R.I.) Nat'l Ass'n*, 280 F.3d 384, 390 (3d Cir. 2002).

While TILA offers a "range of remedies to achieve its goals," *Vallies v. Sky Bank* (*Vallies II*), 591 F.3d 152, 156 (3d Cir. 2009), central among them are consumer suits, which Congress sought to "encourag[e] . . . to deter violations of the Act," *Johnson v. W. Suburban Bank*, 225 F.3d 366, 374–75 (3d Cir. 2000). TILA provides a private right of action, 15 U.S.C. § 1640(a), to all "consumers who suffer damages as a result of a creditor's failure to comply with TILA's provisions." *Household Credit Servs., Inc. v. Pfennig*, 541

4

U.S. 232, 235 (2004). Section 1640(a) permits recovery of actual damages, statutory damages, costs, and attorneys' fees, and, as relevant here, may be used as a basis for a claim against "any creditor who fails to comply with any requirement imposed under [15 U.S.C. §§ 1631–1651], including any requirement under . . . [15 U.S.C. §§ 1666–1666j]."

This case involves two of those requirements: (1) a TILA provision known as the "Fair Credit Billing Act," which requires a creditor to comply with particular obligations when a consumer has asserted that his billing statement contains an error, 15 U.S.C. § 1666; and (2) TILA's unauthorized-use provision, which requires a credit card issuer to satisfy certain conditions before holding a cardholder liable for the unauthorized use of a credit card, including limiting the cardholder's liability to $50, 15 U.S.C. § 1643.

### 1. *The Fair Credit Billing Act*

Shortly after enacting TILA, Congress amended it by way of the Fair Credit Billing Act (FCBA), Pub. L. No. 93-495, 88 Stat. 1511 (1974) (codified as amended at 15 U.S.C. §§ 1666–1666j). Building on TILA's original goal of "requir[ing] . . . full disclosure of credit charges . . . so that the consumer can decide for himself whether the charge is reasonable," S. Rep. No. 90-392, at 1 (1967), the FCBA aims to "protect the consumer against inaccurate and unfair credit billing and credit card practices," 15 U.S.C. § 1601(a). As relevant here, the FCBA imposes on creditors "requirements . . . for the correction of billing errors." *Am. Express Co. v. Koerner*, 452 U.S. 233, 234 (1981).

5

The "primary" such requirement, at issue in this case, is that if a creditor receives "written notice" from a consumer that "indicates [his] belief that [his] statement contains a billing error" within 60 days after the creditor transmitted that statement, the creditor must comply with "two separate obligations." *Id.* at 234, 236 (citing 15 U.S.C. § 1666(a)). First, within 30 days of receiving that written notice, it must acknowledge receipt to the consumer in writing. 15 U.S.C. § 1666(a)(3)(A). Second, within two billing cycles and "in no event later than ninety days" after the consumer files his written dispute, it must either (1) "make appropriate corrections" to the consumer's account, "including the crediting of any finance charges on amounts erroneously billed," or (2) "conduct[] an investigation" into the dispute and "send a written explanation" to the consumer "setting forth to the extent applicable the reasons why the creditor believes the account . . . was correctly shown in the statement." *Id.* § 1666(a)(3)(B)(i)–(ii). The creditor must take these steps "before making any attempt to collect the disputed amount." *Am. Express*, 452 U.S. at 237.

## 2. *TILA's Unauthorized-Use Provision*

While the FCBA applies to all creditors, including credit card issuers, Congress elsewhere amended TILA to include another layer of protection specifically for consumers who use credit cards. Act of Oct. 26, 1970, Pub. L. No. 91-508, 84 Stat. 1114, 1126–27. Responding in part to the then-"relatively recent development" of unsolicited credit cards, S. Rep. No. 91-739, at 2 (1970), Congress also took aim with these amendments at an issue "associated not only with unsolicited credit cards but with all credit cards—the problem of liability in the event the card is lost or stolen," *id.* at 5.

6

Because, even after TILA was enacted, "[m]ost credit card agreements" held a consumer liable for any losses incurred by the unauthorized use of a credit card before the consumer had notified the issuer that the card had been lost or stolen, Congress recognized that a consumer's failure to "immediately discover and report" a loss or theft could result in his being held liable for "thousands of dollars in unauthorized purchases made by a fast working thief." *Id.* What's more, there was "little incentive" for card issuers to "take precautionary action" because any such liability could "always be passed on to the cardholder." *Id.*

To fix this problem, Congress enacted 15 U.S.C. § 1643, entitled "Liability of holder of credit card," to "safeguard the consumer . . . by limiting the liability of consumers for the unauthorized use of credit cards." S. Rep. No. 91-739, at 1. The statute accomplishes this goal by "plac[ing] the risk of fraud primarily on the card issuer," and requiring the issuer to "demonstrate that it has taken certain measures to protect the cardholder from fraud before it can hold a cardholder liable for any unauthorized charges." *DBI Architects, P.C. v. Am. Express Travel-Related Servs. Co.*, 388 F.3d 886, 892 (D.C. Cir. 2004). Under § 1643, an issuer may hold a cardholder liable for the unauthorized use of a card "only if" certain conditions are met. 15 U.S.C. § 1643(a)(1).

Three of those conditions feature here. First, for liability to be imposed by the issuer, it must have given the cardholder "adequate" notice both of his potential liability and of how to notify the issuer in the event of the loss or theft of the card before the unauthorized use. *Id.* § 1643(a)(1)(C)–(D). Second, the issuer may only impose liability for

7

unauthorized use that "occurs before the . . . issuer has been notified that an unauthorized use of the credit card has occurred or may occur." *Id.* § 1643(a)(1)(E). Finally, any liability imposed may not be "in excess of $50." *Id.* § 1643(a)(1)(B). The requirement that an issuer meet these conditions before imposing liability is a strict one: "Except as provided in [§ 1643], a cardholder incurs no liability from the unauthorized use of a credit card." *Id.* § 1643(d).

With TILA's framework in mind, we now turn to the facts of this case.

## B.    Factual Background

As this is an appeal from a grant of a motion to dismiss, the factual allegations are taken from the operative amended complaint and are accepted as true. *Trzaska v. L'Oreal USA, Inc.*, 865 F.3d 155, 162 (3d Cir. 2017). In June 2015, soon after William Krieger noticed his home computer had stopped working, he received a phone call from an individual identifying himself as a Microsoft employee and telling Krieger his computer had a virus and the caller needed to access the computer remotely to fix it. Krieger acquiesced, but, while the caller was accessing the computer, Krieger's daughter arrived home and, upon learning what was happening, suggested the call was "probably a scam" and disconnected the computer. App. 27. As she did so, Krieger saw his Bank of America credit card number flash across the screen.

Alarmed, Krieger called Microsoft, only to learn that the original caller was not a Microsoft employee. Krieger

8

then called BANA to check whether the incident had resulted in any unauthorized charges on his credit card. The call confirmed his fears: a $657 Western Union money transfer had just been purchased on his card. Although Krieger protested to BANA's representative that the money transfer was unauthorized and that his account was "compromised," he was told that, until he received his next monthly billing statement, "nothing could be done." App. 28.

Sure enough, when Krieger received his next BANA statement, around July 29, it included the $657 Western Union charge. Consistent with the instructions he was given earlier, he called BANA again. During that July 29 call, however, Krieger was again told BANA "could do nothing," this time because Western Union had "already authorized the payment." App. 29. Now "no longer happy" with BANA, Krieger told the representative he wished to cancel his account entirely. App. 29. That, apparently, caused BANA to reconsider.

Mere hours later, BANA called Krieger back with a change in plans: BANA offered to "credit [his] account while it conducted an investigation on the unauthorized use." App. 29. And within a few days, it sent Krieger a letter confirming, pursuant to that call, that it had "issued [a] credit[] to [his] account for the disputed charge[]" that "w[ould] appear on [his] monthly statement," and that, while Western Union would "have the opportunity to review the information and provide additional documentation to support why they feel the transaction[] is valid," BANA "consider[ed] [the] dispute[] resolved." App. 46. On Krieger's next statement, in mid-August, a "-$657" credit was posted to his

account, App. 49, and Krieger "believed that the matter had been resolved," App. 30.

His belief was short-lived. In mid-September, Krieger opened the mail to find a very different letter. In this one, BANA advised him that Western Union had "provided a copy of the sales slip[] as verification of the charge[]" whose information "matche[d] the home address, phone number, or email address . . . listed on [his] account." App. 51. The slip itself, which was attached to the letter, revealed the charge had been paid out to one "Amit Rajak," in "Mumbai," India, App. 64, and the letter declared that the charge was "valid" and therefore "w[ould] be rebilled," App. 51. In his amended complaint, Krieger alleged that he "does not know anyone named Amit Rajak" and "has never been to India." App. 31. Nonetheless, the $657 charge appeared on Krieger's next statement, which he received a week later (the "September 18 statement").[2]

Frustrated by BANA's about-face, Krieger quickly sent the company a two-page letter describing, in detail, the entire sequence of events. In that letter, which BANA received on September 29, Krieger again emphasized that the

---

[2] Notably, after receiving this statement, Krieger called Western Union, where, to his surprise, he learned that, although BANA had told him on July 29 that Western Union had already authorized the payment, the money transfer had not been paid out until August 1. In other words, before Western Union completed the transaction, Krieger had informed BANA "multiple times that the charge was unauthorized." App. 32.

charge was unauthorized and requested it be "remove[d] . . . altogether." App. 57. BANA denied Krieger's request in a letter saying only that, while it had "re-examined" the charge, the information provided by Western Union still matched that on Krieger's account and thus BANA still considered the charge valid. App. 62. To avoid late fees and interest, Krieger paid BANA the entire $657 before turning to the courts.

## C. Procedural Background

Originally filed in state court and then removed by BANA to the Middle District of Pennsylvania, Krieger's amended complaint included two claims relevant here: one under the FCBA and one under TILA's unauthorized-use provision. As the basis for his FCBA claim, Krieger alleged that he had timely submitted a written notice of billing error regarding the $657 charge and BANA had neither credited the charge nor conducted a reasonable investigation. As the basis for his unauthorized-use claim, Krieger alleged that BANA imposed liability for more than $50 by billing him the full amount when it had reason to believe the charge was unauthorized. Both claims were brought under TILA's private right of action, 15 U.S.C. § 1640, and, for each, Krieger requested statutory damages, costs, attorneys' fees, and "actual damages." App. 35–36.

The District Court, however, dismissed Krieger's complaint with prejudice for failure to state a claim. *Krieger v. Bank of Am., N.A.*, No. 4:16-CV-00830, 2017 WL 168161, at \*7 (M.D. Pa. Jan. 17, 2017). Starting with the FCBA claim, it determined that the operative billing statement, i.e., the statement that triggered the 60-day period in which Krieger was required to dispute the charge in writing, was the

11

July 29 statement where the Western Union charge first appeared. *Id.* at *4. Working off that premise, the District Court reasoned that, because the "absolute earliest date" on which that statement "could have been issued" was "July 28," and BANA did not receive Krieger's written notice until September 29—63 days later—the notice was untimely, BANA's obligations under the FCBA were "never triggered," and liability on this claim "c[ould] therefore not be imposed." *Id.* While Krieger had argued the 60-day period should have been calculated from the September 18 statement where BANA first reinstated the charge, the District Court dismissed that as an "inspired argument[] concerning what [Krieger] believes the law *should be*," and contrary to the "plain language" of TILA's implementing regulation (known as "Regulation Z"),[3] which requires that written notice be

---

[3] In enacting TILA, Congress "granted the [Federal Reserve] Board the authority to issue regulations to achieve TILA's purposes," *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 198 (2011), and, pursuant to this "expansive authority . . . to elaborate and expand the legal framework governing commerce in credit," the Federal Reserve promulgated Regulation Z, *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 559–60 (1980). In 2010's Dodd–Frank Wall Street Reform and Consumer Protection Act, Congress reassigned this regulatory authority to the Consumer Financial Protection Bureau (CFPB), *see* 15 U.S.C. § 1604(a), and today, Regulation Z is codified within the CFPB's regulations at 12 C.F.R. pt. 1026, as are the CFPB's own Official Staff Interpretations of TILA and Regulation Z, *see* 12 C.F.R. pt. 1026, supp. I, pt. 1 (*Official Interpretations*). Because the agency's guidance is "published in accordance with the broad powers that Congress delegated to the [CFPB]

transmitted within 60 days after the "first periodic statement that reflects the alleged billing error." *Id.* at \*5 (quoting 12 C.F.R. § 226.13(b)).[4]  Because, in the District Court's view, the first such statement was the July 29 statement, Krieger's written notice was untimely and he failed to state a claim under the FCBA. *Id.*

Moving to the unauthorized-use claim, the District Court initially acknowledged that 15 U.S.C. § 1643 does "place[] limits on the liability of a cardholder for unauthorized use of a credit card," with the "[m]ost pertinent[]" being that such liability may not be "in excess of $50." *Id.*  Nevertheless, construing Krieger's § 1643 claim as seeking "reimbursement" only, the District Court rejected it, drawing on our case law for the proposition that § 1643 "does not provide a cardholder with a right to reimbursement nor a private cause of action." *Id.* (citing *Azur v. Chase Bank, USA, Nat'l Ass'n*, 601 F.3d 212, 217 (3d Cir. 2010); *Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 175 (3d Cir. 2008)).  Rather, the District Court held that § 1643 functions

to fill gaps in the statute," we "defer [to it] quite broadly," *Roberts v. Fleet Bank (R.I.)*, 342 F.3d 260, 265 (3d Cir. 2003), *as amended* (Oct. 21, 2003), that is, as long as the agency's views are not "demonstrably irrational," we treat them as "dispositive," *Ford Motor Credit*, 444 U.S. at 565.

[4] While the relevant section of Regulation Z as promulgated by the CFPB is located at 12 C.F.R. § 1026.13, a materially identical regulation, to which the District Court and BANA cite, also appears at 12 C.F.R. § 226.13 within the Federal Reserve's regulations.  We will cite to the current version of the regulation at § 1026.13.

13

solely as a "limit[] [on] a card issuer's potential recovery for fraudulent purchases." *Id.* Believing Krieger thus was trying to use it "as a sword bent on forcing liability through a novel cause of action" in just the way we had "invalidated" in *Sovereign Bank* and *Azur*, the District Court concluded he also failed to state an unauthorized-use claim under TILA. *Id.* at \*5–7. Krieger timely appealed.

## II. Jurisdiction and Standard of Review

The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291. We review de novo a District Court's dismissal under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014). Like the District Court, we "must accept all facts alleged in the complaint as true and construe the complaint in the light most favorable to the nonmoving party," *Flora v. County of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015), and determine whether the complaint pleads "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III. Discussion

Applying that standard of review, we will reverse the judgment of the District Court because we conclude Krieger has stated claims for relief under both the FCBA and TILA's unauthorized-use provision.

## A. Fair Credit Billing Act Claim

To trigger a creditor's obligation either to credit a disputed charge or to conduct a reasonable investigation into the matter, a consumer must submit a written notice of billing error within 60 days after receiving the statement that contains the error. 15 U.S.C. § 1666(a). Here, the District Court rejected Krieger's claim based on its view that the 60-day period began on July 29, the first time the $657 Western Union charge ever appeared on his billing statement, making the written notice he submitted on September 29, 62 days later, untimely. *Krieger*, 2017 WL 168161, at *4. On appeal, Krieger argues this was improper and, because BANA removed the charge from his statement and only reinstated it on September 18, that was the date the 60-day period ran from, making his notice timely. We agree with Krieger: where, as here, a creditor removes a disputed charge from a billing statement and later reinstates that charge, the 60-day period in which a consumer must file a written dispute begins when the consumer receives the first statement reinstating the charge.

In the discussion that follows, we explain, first, why our holding finds support in the FCBA's text, relevant guidance from the CFPB, and the consumer-protection policies undergirding both TILA and the FCBA, and, second, why the District Court misapplied Regulation Z in reaching the opposite result and dismissing Krieger's FCBA claim.

15

1. *Selecting the Operative Statement in Light of the FCBA's Text, the CFPB's Guidance, and Underlying Policy Concerns*

"[W]e start, of course, with the statutory text[.]" *Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). The FCBA requires that a consumer dispute a billing error only where he "belie[ves] that [his] statement contains a billing error." 15 U.S.C. § 1666(a)(2). In other words, where the statement does not contain any errors, the FCBA does not impose any obligation on the consumer at all. And that makes perfect sense. The consumer's goal in filing a written notice of billing error is to require the creditor either to correct the error or to conduct a reasonable investigation of the claim. *Id.* § 1666(a)(3)(B). Where there is no error, notice would be nonsensical, as was the case here. When Krieger received his August billing statement—which not only did not list the Western Union charge, but, indeed, credited the charge to his account—there was no longer anything to dispute because Krieger had no reason to "belie[ve] that [his] statement contain[ed] a billing error." To put a fine point on it, had BANA not reinstated the charge, there would have been no basis for Krieger to bring an FCBA claim nor any practical reason to do so. Only when BANA decided to reinstate the charge did the FCBA once again become relevant, and, for that reason, only then did the 60-day period begin to run.

This conclusion also comports with CFPB guidance. The agency has specified that, where there is a billing error but the creditor initially fails to send a billing statement, the 60-day period will begin to "run[] from the time the statement should have been sent," but "[o]nce the statement is provided," the consumer will have "another 60 days to assert any billing errors reflected on it." *Official Interpretations*,

16

para. 13(b)(1), § 1.  In other words, even where there is an existing error that the consumer would have reason to dispute so that the 60-day period has started to run, the clock is reset once the charge actually appears on a statement.  If the 60-day period restarts in that circumstance, it would be incongruous to hold it does not where, as here, a creditor has affirmatively removed a disputed charge (so that the consumer no longer has any reason to file a dispute) and only reinstates it on a later statement.  Moreover, we perceive no reason to think allowing such an extension would prejudice unwary creditors.  After all, if a subsequent statement restarts the clock even where a creditor fails to communicate the charge by mistake, surely the same result obtains where a creditor fails to communicate the charge by design.

Finally, we consider the remedial policies underlying TILA and the FCBA.  Congress enacted TILA to "require[] full disclosure of credit charges . . . so that the consumer can decide for himself whether the charge is reasonable," S. Rep. No. 90-392, at 1, and, together with the FCBA, to "protect the consumer against . . . unfair credit billing and credit card practices," 15 U.S.C. § 1601(a).  We, in turn, have emphasized that, because TILA is "designed to provide easily-understood information to ordinary consumers," courts should evaluate information creditors convey to consumers "from the point of view of the consumer." *Rossman*, 280 F.3d at 394.  Thus, we consider the circumstances from Krieger's perspective and ask what a "reasonable consumer . . . would . . . be entitled to assume." *Id.*

So viewed, the approach we adopt today is clearly correct.  The same day Krieger first contacted BANA about the charge, he was told it would be removed while the

17

company conducted an investigation. Shortly thereafter, he received a letter stating that, while Western Union retained "the opportunity to review the information and provide additional documentation to support why they feel the transaction[] is valid," for the time being BANA "consider[ed] [the] dispute[] resolved," App. 46, and on his next billing statement the charge was gone. The "only logical conclusion" a reasonable consumer could reach at that point was that there was "no longer a billing error," Appellant's Br. 21, and that, as Krieger himself believed, "the matter had been resolved in his favor," App. 30.

To hold otherwise would saddle the consumer with an ongoing duty to file a written dispute concerning a seemingly "resolved" dispute or risk forfeiting all rights under the FCBA, and, at the same time, would offer creditors a path to avoid their FCBA obligations altogether by automatically removing a charge in response to a concerned consumer's call—surely a common first response when a curious charge appears on a credit card bill—and then waiting for 60 days to pass before reinstating it. We decline to take a path so antithetical to TILA's purpose of eradicating "unfair[ness]" and "confusi[on]" in the credit markets. 15 U.S.C. § 1601(a); *Ramadan*, 156 F.3d at 502. As we have explained, "[a]llowing lenders to violate" their statutory obligations "but avoid liability if they successfully concealed the violation from the debtor . . . would undermine the core remedial purpose of TILA." *Ramadan*, 156 F.3d at 502.

For the foregoing reasons, we conclude that, where a creditor removes a charge from a consumer's statement only later to reinstate it, the consumer has 60 days after receiving the first statement on which the reinstated charge appears to

18

provide written notice of the billing error. Here, because the first statement on which the disputed $657 Western Union charge appeared after BANA reinstated it was the September 18 statement, and BANA received Krieger's written notice just 11 days later, on September 29, his notice was timely.

2. *The District Court's Reliance on an Inapplicable Regulation*

In concluding that the 60-day period ran from the July 29 statement[5] and dismissing Krieger's claim for failure to state a claim, the District Court held it was "compelled" by language in Regulation Z to look only to the "*first* periodic statement that reflects the alleged billing error." *Krieger*, 2017 WL 168161, at *5 (emphasis added by the District Court) (quoting 12 C.F.R. § 226.13(b)(1)). And in defending that reading on appeal, BANA contends that its "later decision to rebill the Western Union Charge . . . does not

_____

[5] In fact the District Court determined the 60-day period began on July 28, believing that was "the absolute earliest date on which [the] first statement containing the Western Union charge could have been issued." *Krieger*, 2017 WL 168161, at *4. Though immaterial given our holding here, this too was error. The FCBA provides that the 60-day period begins running only when a creditor has "transmitted to an obligor" a statement containing a billing error, 15 U.S.C. § 1666(a), and, "in ordinary meaning and usage, transmission of the mail is not complete until it arrives at the destination," *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006). Thus, even under the District Court's approach to this case, the 60-day period should have begun on July 29, when Krieger alleges he received that statement.

19

restart the FCBA written notice clock" and that Krieger's contrary arguments rely only on "policy" and ignore § 1026.13(b)(1)'s "plain language." Appellee's Br. 20, 22.

While the language of § 1026.13(b)(1) may be plain as applied to a billing error reflected on regularly recurring statements, it has little bearing on the circumstances of this case. Section 1026.13(b)(1) provides that the consumer must provide written notice "no later than 60 days after the creditor transmitted the first periodic statement that reflects the alleged billing error." 12 C.F.R. § 1026.13(b)(1). Put another way, where the consumer initially does not pay a disputed charge so that the charge is carried forward continuously in successive periods, § 1026.13(b)(1) tells us the 60-day period does not restart upon the consumer's receipt of each new "periodic statement that reflects the alleged billing error," but rather runs from the receipt of the first of those statements. And wisely so. Indeed, a contrary rule, where the 60-day period restarted every month just because the charge went unpaid, would effectively read the 60-day requirement out of the statute. But reading this regulation to pertain in the circumstances presented here— where an issuer makes an alleged billing error on one statement, then eliminates that error on subsequent statements by crediting and not rebilling the charge, and then introduces the error into a new series of statements at a later date— would be in tension with § 1026.13(b)'s text and contrary to both common sense and broader policy concerns.[6]

---

[6] To the extent creditors commonly engage in this practice—at oral argument BANA indicated it does so "often," Tr. of Oral Arg. 28:9–20—to resolve billing-error disputes without need to resort to the specific processes set

We start with the regulation's text. BANA argues that "periodic" simply refers to billing intervals so, for example, where statements are issued monthly, the 60 days would run from the first monthly statement on which the alleged error ever appeared, regardless whether there was one or more intervening statements on which the error did not appear. But § 1026.13(b) does not run the 60-day clock from the first time an alleged error appears on "any periodic statement" or even from the first "statement that reflects the alleged billing error"; rather, it runs the clock from the first "periodic statement that reflects the alleged billing error." Because "periodic" means "regularly recurring," *NLRB v. Food Fair Stores, Inc.*, 307 F.2d 3, 11 (3d Cir. 1962), it is at least an equally plausible reading of the regulation that it envisions a series of statements that, on a regularly recurring basis, "reflect[] the alleged billing error" and then runs the 60 days from the first of *that* series. That is to say, where an alleged billing error appears on one or more statements, then ceases to appear because it has been reversed by the issuer, there is no longer any regularly recurring set of statements "that reflect[] the alleged billing error"; only if and when the error is reintroduced and begins to appear on a new series of statements is there a set of statements that are both "regularly recurring" and "that reflect[] the alleged billing error."

And as it turns out, that reading is also the only one that comports with common sense and the consumer-

---

out in the FCBA or litigation, we have no quibble, as "[p]arties do generally benefit from the efficient resolution of disputes," *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 267 (3d Cir. 2003).

protection policies that undergird TILA and the FCBA.[7] *See Abramski v. United States*, 134 S. Ct. 2259, 2267 (2014) (statutory construction requires courts to "interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose[,] . . . not to mention common sense"). The FCBA only requires a consumer to give notice to the issuer where the consumer has some reason to "belie[ve] . . . [his] statement contains a billing error." 15 U.S.C. § 1666(a)(2). Where an alleged billing error has been removed from the consumer's statement and has not been reintroduced, however, not only would there be no reason for a consumer to provide written notice, but the consumer also would be hard pressed to show any injury sufficient to support Article III standing. *See Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549–50 (2016) (emphasizing that "standing requires a concrete injury even in the context of a statutory violation" and that a plaintiff "cannot satisfy the demands of Article III by alleging a bare procedural violation").

Obligating the consumer to dispute a billing error that, from a reasonable consumer's perspective, has been corrected also would undermine Congress's twin goals of guaranteeing "meaningful disclosure of credit terms" to help consumers "avoid the uninformed use of credit" and "protect[ing] . . . consumer[s] against . . . unfair credit billing and credit card

---

[7] Though not necessary for our disposition today, we note that, under our Circuit's precedent, "remedial legislation should be construed broadly to effectuate its purpose." *Long v. Tommy Hilfiger U.S.A., Inc.*, 671 F.3d 371, 375 (3d Cir. 2012).

22

practices." 15 U.S.C. § 1601(a). And it would be inconsistent with the rule that where a creditor has conveyed to a consumer information in a way that is not "clear and conspicuous" but is instead "ambiguous," we require that those "ambiguities . . . be resolved in favor of the consumer."[8] *Rossman*, 280 F.3d at 394.

In sum, Krieger's notice was timely and it was error for the District Court to dismiss his FCBA claim on the basis that it was not.[9]

---

[8] *Humphrey v. U.S. Bank, N.A.*, No. 11-CV-272, 2012 WL 3686272 (N.D. Okla. Aug. 24, 2012), on which BANA relies, is not to the contrary. Although that case likewise arose in the context of a creditor removing and then reinstating a disputed charge, the plaintiff there raised a different claim, i.e., that the creditor violated the FCBA by "failing to perform a reasonable investigation of the [new] dispute that was substantially different from [that for] the [original] dispute," and the district court determined the creditor's original investigation "was reasonable" so that it "ha[d] no further responsibilities" when the consumer "reassert[ed] substantially the same billing error." *Id.* at *2, *5 (quoting 12 C.F.R. § 226.13(h)). *Humphrey* has no bearing where, as here, a consumer claims the creditor never performed a reasonable investigation at any point in the process.

[9] As the District Court did not yet have the opportunity to reach the issue, we will not address BANA's alternative argument that Krieger failed to state a claim because his allegations reflect that BANA conducted a reasonable investigation of the Western Union charge and thus complied with its obligations under the FCBA. Given our holding, we

23

### B. Unauthorized-Use Claim

We now turn to Krieger's claim under 15 U.S.C. § 1643, which provides that a credit card issuer may not hold a cardholder liable for the unauthorized use of a credit card without complying with specific requirements—among them that in no circumstances may liability exceed $50. The amended complaint asserted that BANA violated § 1643 by rebilling Krieger, and hence imposing liability, for the full $657 Western Union charge knowing it was potentially unauthorized, and that this violation caused him "actual damages." App. 36. The District Court dismissed the claim, accepting BANA's arguments that § 1643 does not give a cardholder any private right of action at all and that, even if it does, Krieger was seeking reimbursement for the $657 charge which is not a type of relief the statute authorizes. *Krieger*, 2017 WL 168161, at *5. Those arguments, however, misconstrue the nature of Krieger's claim and misread our case law interpreting § 1643.

TILA's private right of action provides that "any creditor who fails to comply with any requirement imposed under [15 U.S.C. §§ 1631–1651] . . . with respect to any person is liable to such person" for relief that includes "any actual damage sustained by such person as a result of the failure." 15 U.S.C. § 1640(a). That includes "any requirement" of § 1643, and as "requirement" simply means "a requisite or essential condition," *Requirement*, Webster's Third New International Dictionary 1929 (1961) (def. b),

also have no occasion to address Krieger's alternative argument that the 60-day period should be subject to equitable tolling.

24

§ 1640 thus provides a private right of action against an issuer that fails to comply with the conditions of § 1643 before holding the cardholder liable for the unauthorized use of a credit card.

The requisite conditions are: (1) disclosing to the cardholder previously the "maximum potential liability," 12 C.F.R. § 1026.12(b)(2)(ii), and a means by which the cardholder may notify the issuer in the event the card is lost or stolen, 15 U.S.C. § 1643(a)(1)(C)–(D); (2) conducting a reasonable investigation of the cardholder's claim of unauthorized use, *Official Interpretations*, para. 12(b), § 3; (3) not imposing liability that arose after it was notified that the unauthorized use would or could occur, 15 U.S.C. § 1643(a)(1)(E); and (4) limiting any liability it seeks to impose to $50, *id.* § 1643(a)(1)(B). If the issuer does not meet these conditions, then the cardholder "incurs no liability from the unauthorized use of a credit card," *id.* § 1643(d), and if the issuer nonetheless seeks to impose liability on the cardholder without satisfying these conditions, it has "fail[ed] to comply with [a] requirement imposed under [§ 1643]," giving rise to an action under § 1640.

Here, Krieger chose to anchor his claim in the last condition, the $50 liability limit, because BANA rebilled him for the $657 charge after receiving notice it was unauthorized. Expressly referencing "15 U.S.C. § 1640," the amended complaint demanded judgment in Krieger's favor and relief that included "actual damages." App. 36. In other words, Krieger alleged that BANA caused him actual damages by violating a requirement of § 1643, and he invoked § 1640, which authorizes him to sue on that claim. Krieger therefore did state an unauthorized-use claim, and in dismissing that

25

claim on the ground that § 1643 itself does not provide consumers with a private right of action, the District Court failed to recognize that § 1640 does.

The District Court also erred in rejecting Krieger's claim as an attempt to seek "reimbursement" under § 1643. Citing *Sovereign Bank* and *Azur*, the District Court held that § 1643 "does not provide a cardholder with a right to reimbursement," but only "limit[s] a card issuer's potential recovery for fraudulent purchases." *Krieger*, 2017 WL 168161, at *5. BANA likewise argues on the basis of those cases that § 1643 "does not impose any requirement on card issuers." Appellee's Br. 29. Indeed, when asked at oral argument how Krieger, having paid the $657 charge, could now limit his liability under § 1643 to $50, BANA answered simply: "He can't[.]" Tr. of Oral Arg. 44:3–9.

But those conclusions do not follow from our precedents. In *Sovereign Bank*, after consumers' credit card information was stolen from a retailer, a card issuer sued the retailer for equitable indemnification based on the theory that § 1643 would require the issuer to reimburse any losses suffered by its cardholders in excess of $50. 533 F.3d at 166, 174. We held that, because "§ 1643 does not address, nor is it even concerned with, the liability of an Issuer or any party other than the cardholder for unauthorized charges on a credit card," the issuer did not have an affirmative "obligat[ion] . . . to reimburse its cardholders' accounts" and therefore could not "forge an equitable indemnification claim from the provisions of the TILA." *Id.* at 175.

In *Azur*, when the plaintiff discovered that his personal assistant, to whom he had entrusted his financial affairs, had

26

fraudulently withdrawn over $1 million from his credit card over a seven-year period and had paid off the card with funds from the plaintiff's own bank account, the plaintiff brought suit against the issuer under § 1643, claiming "reimbursement" of the misappropriated funds. 601 F.3d at 214–15, 215 n.7, 217. We dismissed this claim, concluding that the plaintiff's personal assistant had apparent authority to use his credit card so that the charges were not "unauthorized" within the meaning of § 1643, and that, in any event, as we held in *Sovereign Bank*, "§ 1643 . . . does not provide the cardholder with a right to reimbursement." *Id.* at 217–18, 222.

Neither of those cases addressed an issuer's violation of § 1643 by imposing over $50 in liability on a cardholder even after it was notified that the charges had been unauthorized. Nor did they mention, much less address, a cardholder's right under § 1640 to recover "actual damages."

The distinction between "reimbursement" and "actual damages" is significant. Unlike "reimbursement," which means "[r]epayment," *Reimbursement*, Black's Law Dictionary (10th ed. 2014), "actual damages," as we have interpreted the term in this very context, is tethered to total "actual losses," and, therefore, is "[a]n amount awarded to a complainant to compensate for a proven injury or loss," *Vallies II*, 591 F.3d at 157 (citation omitted). "Actual damages" under TILA thus serve to "compensate . . . consumers" to the full extent they have "suffered actual harm." *Id.* at 158. That is the relief Krieger seeks here: not merely reimbursement of the $657 charge he paid under protest but the full "amount . . . to compensate" him for the "actual harm" he may be able to "prove[]" as a result of

27

BANA's violation of § 1643. *Vallies II*, 591 F.3d at 157–58. *Sovereign Bank* and *Azur* do not stand in the way of that claim.

As a last line of defense, BANA argues that we should affirm on the alternative ground that merely demanding payment on a billing statement does not violate § 1643 because it does not impose "liability" on a cardholder. Instead, according to BANA, § 1643 only applies where an issuer "impose[s] . . . liability" for unauthorized use "through the litigation process"—that is, by "su[ing] a cardholder." Tr. of Oral Arg. 41:18–19. By this logic, if the cardholder is sufficiently sophisticated to know his liability will be capped at $50 and the late fees and interest he incurs will be removed from his bill if he withholds payment, he will refuse to pay and force the issuer to sue him for no more than $50; but if the cardholder is not so savvy and pays his monthly bill—or has signed up for automatic payments—he is simply out of luck.

Not so. BANA's constricted reading of "liability" is contrary to § 1643's text, structure, and purpose. As for the text, § 1643 is entitled "Liability of holder of credit card," and mandates that in no circumstances will a cardholder incur "liability" for unauthorized use "in excess of $50," or for any use "[e]xcept as provided in this section." 15 U.S.C. § 1643(a)(1)(B), (d). "Liability," in turn, means "[t]he quality, state, or condition of being legally obligated or accountable." *Liability*, Black's Law Dictionary (10th ed. 2014); *see Azur*, 601 F.3d at 217 ("'Liable' means . . . 'legally obligated.'"). And as we have explained, a consumer's "legal obligations attach" when he "consummat[es] . . . the . . . credit agreement," *Rossman*, 280 F.3d at 389, and continue to

28

bind him as long as he is "legally required to perform [them] under the terms of the [contract]," *In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 209 (3d Cir. 2001). A cardholder is thus legally obligated to pay the charges that appear on his bill, and the notion that he does not unless and until the issuer brings an action against him in court[10] no doubt would come as a surprise to Congress, which enacted § 1643 in part to address the "problem of liability" where an issuer did not sue over a disputed charge but only "insisted on being paid."[11] S. Rep. No. 91-739, at 5.

What's more, many of the requirements with which the issuer must comply before it may impose "liability" under the statute would make no sense if "liability" were viewed as not being "impose[d]" until the issuer obtained a judgment in court.[12] For example, issuers, before imposing liability, must

---

[10] Of course, as the statute itself recognizes, one way an issuer may "enforce liability" is by bringing such an "action." 15 U.S.C. § 1643(b).

[11] The Senate Report on § 1643 "illustrate[d]" this problem by describing a case where a family lost their credit card and notified their bank, only to learn that a "thief had made purchases of over $1,500"—and, even though the card had a credit limit of only $400, the "bank insisted on being paid for the full $1,500." S. Rep. No. 91-739, at 5.

[12] BANA's reliance for this point on our language in *Azur* that § 1643 "limits a card issuer's ability to sue a cardholder" and "does not . . . enlarge a card issuer's liability," 601 F.3d at 217, is misplaced. In *Azur* and *Sovereign Bank*, on which *Azur* relied, we held only that § 1643 was concerned with "the liability [of] . . . the

have a "means to identify the cardholder on the account," 12 C.F.R. § 1026.12(b)(2)(iii), must "adequate[ly]" disclose to the cardholder the "maximum" potential liability, *id.* § 1026.12(b)(2)(ii), and must "conduct a reasonable investigation of the claim" of unauthorized use, *Official Interpretations*, para. 12(b), § 3. Where an issuer does "not . . . impose liability," it is expressly excused from those obligations. *See Official Interpretations*, paras. 12(b), § 2, 12(b)(2), § 1 (providing that, in such a case, the issuer "need not conduct any investigation of the cardholder's claim" or "comply with the disclosure and identification requirements discussed in § 1026.12(b)(2)").

Adopting BANA's reading of "liability" would mean that issuers could pressure cardholders by continuing to bill them for unauthorized charges plus penalties and interest without meeting these conditions, and that Congress provided no claim for relief under TILA unless and until the cardholder was haled into court to litigate contested charges. That result, however, would thwart TILA's purpose of giving consumers "meaningful guidance" early in the process, *Anderson Bros. Ford v. Valencia*, 452 U.S. 205, 222–23 (1981), and "enabling [them] to shop around for the best cards," *Rossman*, 280 F.3d at 390.

---

cardholder," not of the issuer. *Sovereign Bank*, 533 F.3d at 175; *see Azur*, 601 F.3d at 217. We did not have occasion to and did not address the question whether a cardholder "incurs . . . liability," 15 U.S.C. § 1643(d), from the inclusion of a charge on a statement even after it has been disputed. For the reasons explained here, such contractual liability constitutes "liability" under that section.

30

In addition, that result would contravene the purpose of § 1643: consumer protection. This goal is decidedly not served by forcing every cardholder billed for an unauthorized charge to pick between twin evils: (1) refusing to pay, and risking late fees, interest, and rate increases, *see* 15 U.S.C. § 1637(b)(11)(B)(ii), (b)(12); or (2) paying, and forfeiting his right to limited liability altogether. And BANA's proposed interpretation would not only deprive a consumer of any remedy unless he was willing to risk the consequences of refusing to pay, but also would arbitrarily and irrationally penalize unsophisticated consumers who do not realize a charge was unauthorized until after they have paid their bill, as well as those who use automatic payment plans, *see* 12 C.F.R. § 1026.13(d) (recognizing these plans). Yet as a consumer protection statute, § 1643 is not intended for the most sophisticated consumer. To the contrary, we interpret it from the perspective of a "reasonable consumer," *Rossman*, 280 F.3d at 394, i.e., one who is not "particularly sophisticated." *Palmer v. Champion Mortg.*, 465 F.3d 24, 28 (1st Cir. 2006). Because it is irrational to believe Congress intended to treat consumers who responsibly pay their bills more harshly than those who do not, we "decline to base an interpretation of the statute on" such a "happenstance." *United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co.*, 944 F.2d 1149, 1159 (3d Cir. 1991).

We conclude that a cardholder incurs "liability" for an allegedly unauthorized charge when an issuer, having reason to know the charge may be unauthorized, bills or rebills the cardholder for that charge. When an issuer does so, it must comply with the requirements of § 1643, and when a cardholder alleges those requirements were violated, those

31

allegations may state a claim under § 1640. Krieger has stated such a claim, and we will reverse the District Court's decision to the contrary.

## IV. Conclusion

For the foregoing reasons, we will reverse and remand for proceedings consistent with this opinion.